OPINION
 

 WIDENER, Circuit Judge:
 

 This case, which arises under the Comprehensive Enyironmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq., stems from the removal of soil contaminated with polychlori-nated biphenyls (PCBs) from a site formerly owned and operated by Carolina Transformer, Inc. From 1959 until 1984, Carolina Transformer salvaged and repaired used electrical transformers at the site. During the salvage and repair operations, dielectric fluid from inside the transformers (also known as transformer oil), which contains the carcinogen PCB, was spilled or dumped on the ground at the site. In this action, the United States sued Carolina Transformer Co., Inc., FayTranCo., Inc., Dewey Strother and Kenneth Strother to recover costs incurred in decontaminating the Carolina Transformer site. The United States also sought to recover punitive damages for the defendants’ refusal to comply with an administrative order issued by the United States Environmental Protection Agency (EPA) pursuant to Section 106 of CERCLA, 42 U.S.C. § 9606.
 
 [1]
 

 The district court granted summary judgment in favor of the United States, finding all of the defendants jointly and severally liable for the costs incurred in decontaminating the Carolina Transformer site, and for punitive damages for their refusal, without sufficient cause, to comply with EPA’s cleanup order. 739 F.Supp. 1030. In a subsequent order, the district court awarded the United States its response costs, plus punitive damages in the amount of three times the Government’s costs.
 

 FayTranCo and the individual defendants, Dewey and Kenneth Strother, appeal. They raise two major issues. First, the Strothers contend that summary judgment was improperly granted against them because there were material issues of fact as to whether either of them “owned or operated” the Carolina Transformer site within the meaning of CERCLA § 107(a), 42 U.S.C. § 9607(a). Second, FayTranCo. contends that material issues of fact remain as to whether it was a successor-in-
 
 *835
 
 interest to Carolina Transformer and, therefore, liable for Carolina Transformer’s acts.
 

 We review the grant or denial of summary judgment de novo, applying the same standard applied by the district court.
 
 Overstreet v. Kentucky Central Life Ins. Co.,
 
 950 F.2d 931, 938 (4th Cir.1991). On summary judgment, we must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).
 

 The background facts of the case follow. Dewey Strother and two others formed Carolina Transformer Co., Inc. in 1959 for the purpose of repairing and rebuilding electrical transformers and selling rebuilt transformers. Dewey Strother became Carolina Transformer’s sole stockholder in 1962 and remained such at all times relevant here. He was Carolina Transformer’s president from 1962 through December 1981 and was chairman of its board of directors from 1977 through 1981.
 

 Kenneth Strother, Dewey Strother’s son, was a director and secretary of Carolina Transformer from 1973 through 1984, and took over as its president on January 1, 1982, a position Kenneth held until September, 1984. Carolina Transformer stopped doing business in late 1984 or early 1985.
 

 FayTranCo., Inc. was incorporated in 1979 by Daniel Wiser and Kenneth Strother. FayTranCo’s initial board of directors consisted of Kenneth Strother, Daniel Wiser, and Merriel Williams, who later succeeded Kenneth Strother as President of Carolina Transformer. In addition to being an incorporator and member of the board of FayTranCo, Kenneth Strother was its president from 1979 at least until the time of the third amended complaint, which was filed in September 1988. Kenneth Strother and Sharon Peele, his sister, each owned half of FayTranCo’s outstanding stock. Kenneth’s stepmother, Sylvia Strother, supervised the bookkeeping at FayTranCo, as she had done at Carolina Transformer.
 

 The controversy in this case involved Carolina Transformer’s business location, a five-acre tract on Middle Road' near Fay-etteville, North Carolina (the Middle Road site). Carolina Transformer itself, as a corporate entity, owned the site. The Middle Road site is lowlying and swampy. Surface water drains from the site through a culvert into an unnamed tributary of the Cape Fear River.
 

 From 1967 through late 1984, Carolina Transformer operated an electrical transformer rebuilding, repair and sales business on the Middle Road site. Transformers were delivered to the site and stored until repaired. During the salvage operations, transformer oil containing polychlori-nated biphenyls (PCBs) was dumped, spilled or leaked from the used transformers onto the ground at the Carolina Transformer site. It is admitted by the defendants that PCBs are hazardous substances within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).
 

 In 1984, the EPA determined that the oil containing PCB had migrated from the surface of the site through leaching and surface water flow, and that a release or substantial threat of release of PCBs into the environment existed at the site. On March 5, 1984, EPA issued an administrative order pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a), directing Carolina Transformer to remove PCB-contaminated soil from the site and to conduct other response actions. Carolina Transformer failed to comply with the order, and, as a result, in August 1984, the EPA itself performed a clean-up operation at the site.
 
 [2]
 
 Carolina Transformer stopped doing business at the Middle Road site in January 1984. At this time Carolina Transformer sold its vehicles, shop equipment and surplus copper to Fay-TranCo for a total of $50,934. In September 1984, Carolina Transformer conveyed
 
 *836
 
 the Middle Road site itself to David Miller and Edward Pearson. Pearson and Miller then conveyed the property to Cumberland Electrical Repair, Inc., which had been formed for the purpose of taking over the Carolina Transformer operation at Middle Road. A creditor of Carolina Transformer attacked these two transfers as fraudulent conveyances, and a state court agreed, ordering that. Cumberland Electrical Repair reconvey the property to Carolina Transformer.
 

 The district court granted the Government’s motion for summary judgment against the individual defendants, Dewey Strother and Kenneth Strother, finding them jointly and severally liable for the total amount of the Government’s response costs. They argue that the district court erred in granting summary judgment against them because there are material issues of fact as to whether either of them “owned or operated” the Carolina Transformer site within the meaning of CERCLA § 107(a), 42 U.S.C. § 9607(a).
 

 Subsequent to the argument of this appeal, we decided
 
 Nurad, Inc. v. Hooper & Sons Co.,
 
 966 F.2d 837 (4th Cir.1992), which addressed some of the questions presented here.
 
 [3]
 
 As
 
 Nurad
 
 holds, § 9607(a) imposes liability for costs incurred in responding to a “release” of hazardous substances at any “facility” upon any person who “owned” or “operated” the facility at the time of “disposal” of a hazardous substance. 42 U.S.C. § 9607(a)(2). A facility is defined to include any “area” in and around which hazardous substances have “come to be located”.
 
 Nurad,
 
 966 F.2d at 842-843. Such an owner or operator is strictly liable for costs incurred in responding to the release of hazardous substance at the facility, subject only to the defenses set forth in § 9607(b), which are not applicable here.
 
 Nurad,
 
 966 F.2d at 841. CERCLA authorizes joint and several' liability.
 
 United States v. Monsanto Co.,
 
 858 F.2d 160, 171 (4th Cir.1988),
 
 cert denied,
 
 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989).
 

 Dewey and Kenneth Strother do not contest that the transformer oil containing PCBs is a hazardous substance, or that the Carolina Transformer site is a “facility,” or that, if they are liable as owners or operators, the imposition of joint and several liability is proper. Their argument on appeal is that the district court erred in granting summary judgment for the Government because material issues of fact remain as to their status as “owners” or “operators” of the Carolina Transformer facility at the time of “disposal” of a hazardous substance.
 

 Because we find that both Dewey and Kenneth Strother qualify as “operators” of the Carolina Transformer facility at the time that a hazardous substance was “disposed” there, we need not consider whether Dewey Strother, as the sole shareholder of Carolina Transformer, could qualify as an “owner” of the facility based on a theory of piercing the corporate veil.
 

 Our decision in
 
 Nurad
 
 considered the meaning of the word “operator” in § 9607(a)(2).
 
 [4]
 
 In
 
 Nurad,
 
 a private party and present owner, Nurad, sought recovery under § 9607 for the costs it had incurred in removing and decontaminating the soil surrounding several underground storage tanks. Nurad sought recovery from, among others, several former tenants at the site. The district court dismissed Nu-rad’s claims against the tenant defendants on the ground that the tenants did not “operate” a “facility.” Nurad argued that the district court had too narrowly defined the term “operator” to include only those persons “who actually exercised control over the facility.” On appeal, we held that the district court had applied the correct standard in holding that the tenant defendants “need not have exercised actual con
 
 *837
 
 trol in order to qualify as operators under § 9607(a)(2), so long as the authority to control the facility was present.”
 
 Nurad
 
 went on to state that “authority to control — not actual control — [is] the appropriate standard,” explaining that “[t]his is the definition of the word ‘operator’ that most courts have adopted, and it is one which properly declines to absolve from CERCLA liability a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup.”
 
 Nurad,'
 
 966 F.2d at 842.
 

 Because § 9607(a)(2) imposes liability on any person who “owned
 
 or
 
 operated” (italics added) a facility “at the time of disposal,”
 
 Nurad!
 
 s holding as to the liability of a person who
 
 owned
 
 a facility at a time when hazardous waste was spilling or leaking, applies with equal force to a person who
 
 operated
 
 a facility at such a time.
 

 We are of opinion that there is no genuine issue of material fact that Dewey and Kenneth Strother each had the authority to control the Carolina Transformer facility at the time that transformer oil containing PCBs either was spilled or dumped there or leaked from the site into the surrounding groundwater.
 

 Dewey Strother was an incorporator of Carolina Transformer and its sole stockholder from 1962 through 1969. He was its president from 1962 through 1981 and its chairman of the board from 1977 through 1981. In his deposition, he acknowledged that he was “in charge” of the company and that he was “responsible” for what went on upon the company’s property.
 

 Kenneth Strother was a director of the company from 1973 through 1984 and president from 1981 through 1984. He admitted the Government's allegation that, at some of the times relevant to the complaint, he operated or otherwise controlled operations on the property in question. As president of the company, in his deposition, he described his basic responsibilities as everyday operations of the company, delegation of authority, management of the company; and agreed that he had responsibility for the entire operation of the company.
 

 In these circumstances and on these facts, there was no error in the district court’s holding that the record established that both Dewey and Kenneth Strother were “operators" within the meaning of the statute, for each of them had a right to control its operations. In that connection, we should say that we have not recited all of the many facts which support the district court’s holding.
 

 FayTranCo argues that the district court erred in granting summary judgment against it under CERCLA as the successor corporation to Carolina Transformer.
 

 As indicated above, 42 U.S.C. § 9607(a)(2), imposes liability on any “person” who owned or operated a facility at the time of disposal of hazardous waste. The term “person” is defined in 42 U.S.C. § 9601 to include “corporations.” However, the statute is silent as to whether successor corporations may be held liable. Three of the circuits have recognized that successor corporations may be liable under CERCLA.
 
 The Anspec Co., Inc. v. Johnson Controls, Inc.,
 
 922 F.2d 1240 (6th Cir. 1991);
 
 Louisiana-Pacific Corp. v. ASARCO, Inc.,
 
 909 F.2d 1260 (9th Cir.1990);
 
 Smith Land & Improvement Corp. v. Celotex Corp.,
 
 851 F.2d 86, 91-92 (3d Cir. 1988),
 
 cert. denied,
 
 488 U.S. 1029,109 S.Ct. 837, 102 L.Ed.2d 969 (1989). We find these opinions persuasive and hold that there may be successor liability under CERCLA, and that there is in this case. We add, however, that while successor liability is permitted under CERCLA, it is not required unless justified by the facts of each case. The national interest in the uniform enforcement of CERCLA and the same interest in preventing evasion by a responsible party by even legitimate resort to state law are the reasons we think the successor liability is appropriate where factually justified. See
 
 Louisiana-Pacific,
 
 909 F.2d at 1263;
 
 Smith Land,
 
 851 F.2d at 92.
 

 In adopting a rule of successor liability in this case we “must consider traditional and evolving principles of federal common law,
 
 *838
 
 which Congress has left to the courts to supply interstitially.”
 
 United States v. Monsanto,
 
 858 F.2d 160, 171 (4th Cir.1988),
 
 cert. denied,
 
 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). We are reminded that since CERCLA is a remedial statute, its provisions should be construed broadly to avoid frustrating the legislative purpose. See
 
 Anspec,
 
 922 F.2d at 1247.
 

 The settled rule is that a corporation which acquires the assets of another corporation does not take the liabilities of the predecessor corporation from which the assets are acquired unless one of four generally recognized exceptions are met: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a “mere continuation” of the predecessor;- or (4) the transaction is fraudulent.
 
 See
 
 Fletcher,
 
 Cyclopedia of the Law of Private Corporations,
 
 § 7122 (rev’d ed 1990);
 
 Mozingo v. Correct Mfg. Corp.,
 
 752 F.2d 168, 174 (5th Cir.1985). The traditional rule with regard to the “mere continuation” exception is that a corporation is not to be considered the continuation of a predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations.
 
 Mozingo,
 
 752 F.2d- at 175. In the case at hand, FayTranCo would not be considered liable as a successor corporation under the traditional approach because there was no overlap of stock ownership between Carolina Transformer and FayTranCo.
 

 The district court chose to follow a second theory the cases have adopted which is sometimes called the “continuity of enterprise” theory. This approach, also referred to as the “substantial continuity” approach, considers a series of factors in determining whether one corporation is the successor to another: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.
 
 See, e.g., Moz-ingo,
 
 752 F.2d at 175; Fletcher,
 
 supra
 
 at § 7123.06.
 
 Cf. Fall River Dyeing & Finishing Corp. v. NLRB,
 
 482 U.S. 27, 43, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987) (reciting approval of a similar “substantial continuity” test, for the purpose of establishing a new company’s obligation to bargain with the old company’s unions, which examines the following factors: (1) whether the business of both the old and new companies is essentially the same; (2) whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and (3) whether the new entity has the same production process, produces the same products, and basically has the same body of customers.) These three factors, mentioned in
 
 Fall River,
 
 are those, incidentally, which the district court mentioned. If the transfer to the new corporation was part of an effort to continue the business of the former corporation yet avoid its existing or potential state or federal environmental liability, of course that should be considered also. See
 
 Fletcher, supra
 
 at § 7330. Applying this multifactor test to the facts of this case, we are of opinion that the district court did not err in finding FayTranCo liable under CERCLA as the successor to Carolina Transformer.
 

 In 1978, the North Carolina State Division of Environmental Management tested water from wells surrounding the Carolina Transformer site and found PCB carrier compounds. Carolina Transformer later paid to have at least one resident connected to city water. Also in 1978, Carolina Transformer hired an engineer to devise a plan for correcting the PCB problem at the site.
 

 Against the background of Carolina Transformer’s emerging environmental problems, in 1979, Kenneth Strother, then a director of Carolina Transformer, and Daniel Wiser, a Carolina Transformer employee, incorporated FayTranCo. After incorporating in 1979, FayTranCo first did business at 2706 Enterprise Avenue, a different
 
 *839
 
 location from that on Middle Road. Only one employee and perhaps a supervisor worked at that location constructing single-phase and three-phase pad mount transformers. In April 1981, construction of a new building was completed at 2816 Enterprise Avenue. This, then, became Fay-TranCo’s business location.
 

 On January 9, 1984, the State of North' Carolina assessed a penalty of $35,000 against Carolina Transformer for violating the state’s PCB standards. On January 20, 1984 Carolina Transformer transferred all of its vehicles, shop equipment and surplus copper to FayTranCo. Three of the vehicles were subsequently resold by FayTran-Co for substantially more than the price at which they were transferred to it by Carolina Transformer. By the end of 1984, Carolina Transformer had transferred all of its assets, with the exception of its land and buildings at Middle Road to FayTran-Co. Although the record suggests that FayTranCo actually paid Carolina Transformer for some of the assets transferred, in other cases FayTranCo offset its liability to Carolina Transformer by creating invoices for parts that were supposedly, but not actually, sold by FayTranCo to Carolina Transformer. In addition, as of April 30, 1989, FayTranCo continued to carry on its books an account payable to Carolina Transformer in the amount of $6,300.60. By mid 1984, Carolina Transformer had moved the vast majority of its operations to the FayTranCo location. All that was left at the Carolina Transformer location on Middle Road was the scrap metal salvaging operation and the few employees who performed this work. All of Carolina Transformer’s employees, with the exception of those few who performed the salvage work, went to work for FayTranCo, doing the same jobs that they had done at Car: olina Transformer. When Carolina Transformer later went out of business, some of the few remaining employees went to Fay-TranCo and others went to work for Cumberland Electric. Then, when Cumberland Electric went out of business, some of its employees also went to FayTranCo. Fay-TranCo does not dispute that those Carolina Transformer employees who went to FayTranCo were employed in the same' jobs, earned the same wages and maintained the same accrued leave time.
 

 Most of FayTranCo’s management also came from Carolina Transformer. Fay-TranCo’s stock was owned 50% by Kenneth Strother and 50% by his sister Sharon Peele. Mrs. Peele was an officer of Carolina Transformer from sometime in 1984 until it stopped doing business. Kenneth Strother was FayTranCo’s president, a position that he held concurrently with his presidency of Carolina Transformer from December 1981 though October 1984. Interestingly, although Kenneth Strother was the president of both Carolina Transformer and FayTranCo during 1984, and Carolina Transformer stopped doing business in late 1984, Carolina Transformer’s 1984 federal income tax return lists Strother’s compensation as an officer of the company and states that he devoted 100% of his time to Carolina Transformer’s business. David Miller, a former Carolina Transformer employee, became a vice president of FayTrhnCo.
 

 Dewey Strother, who was Carolina Transformer’s sole stockholder, did not own any stock in FayTranCo., but he remained connected to FayTranCo in other ways. FayTranCo admits that Dewey Strother owned FayTranCo’s business location and buildings, however it denies that he was the sole owner. An affidavit from FayTranCo’s accountant, however, which was submitted by FayTranCo, states that “Faytranco, Inc. leased the building at Enterprise Avenue, Fayetteville, North Carolina from Dewey Strother,” without mentioning any other owner of the property. While FayTranCo’s two shareholders were not paid dividends, the company paid $60,-000 to Dewey Strother annually in rent for this business location. Dewey Strother maintained an office on FayTranCo’s premises. In fact, undisputed evidence in the record indicates that Dewey Strother specifically requested that this office be designed with a large window so that he could overlook FayTranCo’s shop. Dewey Strother maintained the ability to write checks on FayTranCo’s corporate account.
 
 *840
 
 Other evidence indicated that Dewey Strother participated in the control of Fay-TranCo, in some cases authorizing the purchase of equipment or trucks. Finally, when FayTranCo sold its assets to Fay-Trans Co. in 1988, Dewey Strother personally guaranteed FayTranCo’s performance of its obligations under the contract of sale.
 

 FayTranCo admits that it and Carolina Transformer served some of the same customers, and the record evidence suggests that the number of common customers was significant. Sales personnel continued to call on the same customers that they had served at Carolina Transformer, the only difference being that they now represented themselves as FayTranCo employees. When Carolina Transformer ceased doing business, it sent notices to all of its customers that owed the company money informing them “that Carolina Transformer was changing its name to FayTranco.” These Carolina Transformer accounts receivables then became the accounts of FayTranCo.
 

 As to whether the two corporations produced the same product, FayTranCo stresses that, while Carolina Transformer rebuilt used transformers, FayTranCo built new ones. The evidence in the record concerning the differences between rebuilding a transformer and building a new one, however, indicates that the differences are “very, very minor.” Specifically, the evidence indicates that when Carolina Transformer constructed a transformer it would use some parts that had been salvaged from old transformers, whereas when Fay-TranCo constructed a transformer it used all new parts. Moreover, the evidence indicates that the transformer rebuilding and repair work continued for a period at the FayTranCo location, and that FayTranCo then shifted to the construction of new transformers. In fact, FayTranCo’s articles of incorporation list as being among the purposes for which the corporation was formed “[t]o engage in the business of buying, selling and repairing all types of electrical equipment.” The evidence also indicates that occasionally transformers ostensibly built by the Carolina Transformer corporation, which actually had been physically constructed at FayTranCo’s business location on Enterprise Avenue, were sold to FayTranCo, and occasionally the reverse occurred. On occasion, when a used transformer that could not be repaired arrived at the FayTranCo location on Enterprise Avenue,, it would be taken to the Carolina Transformer location on Middle Road.
 

 FayTranCo also urges that, while Carolina Transformer built pole-mounted transformers, FayTranCo built the pad-mounted type. However, the record indicates that there was a period during which FayTranCo built both pole-mounted and pad-mounted transformers and that over a period of time market conditions forced it to shift its production to the pad-mounted type.
 

 Finally, FayTranCo argues that it should not be held liable as the successor to Carolina Transformer because the transformer dismantling and salvaging operations that had given rise to the PCB contamination at the Carolina Transformer site were not continued at FayTranCo and that, in general, FayTranCo ran a clean operation. In light of the other evidence that FayTranCo was a substantial continuation of the Carolina Transformer business, however, this argument misses the mark. We are unwilling to hold that merely by splitting-off the particular part of its operations that resulted in its environmental problems and shifting the remainder of its assets, employees, management, customers, accounts and production methods to another corporation, an otherwise responsible corporation could all but completely wash its hands of its environmental liability. Such a result, we think, would not serve the remedial purposes of CERCLA, nor would it further the Congressional intent that those responsible for disposal of hazardous wastes, rather than the public, should bear the cost of remedying the pollution.
 

 In sum, we find that there was substantial continuity between Carolina Transformer and FayTranCo. FayTranCo retained most of Carolina Transformer’s employees working in the same jobs, receiving the same salary, and maintaining accrued leave time. Many, if not all, of Carolina Transformer’s supervisory personnel went
 
 *841
 
 to similar positions at FayTranCo. Dewey Strother continued to have personal influence over and involvement with the new company. Carolina Transformer’s equipment, inventory and motor vehicles were transferred to FayTranCo. Moreover, the move to new premises was an integral part of an apparent attempt by those controlling FayTranCo and Carolina Transformer to distance themselves, both physically and legally, from the PCB-contaminated Middle Road site. FayTranCo produced basically the same product as Carolina Transformer, and any changes in the product were dictated by external market forces, which would have operated with equal force on Carolina Transformer had there not been a transfer of the business to FayTranCo. There was a continuity of assets, Carolina Transformer having transferred all of its assets with the exception of the buildings and land at the Middle Road site. FayTranCo held itself out as being a continuation of Carolina Transformer, informing its credit customers that their debts would become the accounts of FayTranCo. Finally, the record as a whole leaves the unmistakable impression that the transfer of the Carolina Transformer business to FayTranCo was part of an effort to continue the business in all material respects yet avoid the environmental liability arising from the PCB contamination at the Middle Road site. For these reasons, we are of opinion that the district court did not err in granting summary judgment against FayTránCo as a successor corporation.
 

 Several other points raised on appeal should be mentioned briefly.
 

 Dewey and Kenneth Strother argue that their motion to dismiss the case should have been granted because they were not given 60 days notice prior to being made parties to the case in the district court. They rely on 42 U.S.C. § 9612(a) as it existed at the time the complaint was filed, which states in relevant part that “[a]ll claims which may be asserted against the Fund pursuant to § 9611 of this Title shall be presented in the first instance to the owner, [or] operator ...” and continues that “[i]n any case where the claim has not been satisfied within 60 days of presentation ...” the claimant may elect to proceed in court. We are of opinion that § 9612(a) provides for actions to be taken prior to claims being asserted against the Fund, not for action to be taken prior to assertion of a claim for reimbursement between the Government and private parties. The district court so held, as do we and the circuits which have decided the question. See
 
 Walls v. Waste Resource Corp.,
 
 823 F.2d 977 (6th Cir.1987);
 
 Idaho v. Howmet Turbine Component Co.,
 
 814 F.2d 1376 (9th Cir.1987);
 
 Dedham Water Co. v. Cumberland Dairy, Inc.,
 
 805 F.2d 1074 (1st Cir. 1986).
 

 The district court awarded, response costs of $977,921.01 and, in addition, punitive damages of three times that amount, $2,933,376.03, for a total of $3,911,684.04. The defendants argue that 42 U.S.C. § 9607(c)(3) does not provide for its punitive damages to be in addition to the recovery of actual response costs, rather the argument goes that the statute provides for a total of three times the response costs, including both actual costs and punitive damages. The Eleventh Circuit, in
 
 United States v. Parsons,
 
 936 F.2d 526 (11th Cir.1991), held that the punitive damages mentioned in the statute may be awarded in addition to the actual response costs. We agree and so hold.
 

 Lastly, we are of opinion that the district court did not abuse its discretion in allowing the Government to file a third amended complaint, although 34 months after the action was first filed. Mere delay does not constitute error, and we do not think the amendment was prejudicial or made in bad faith. Neither was it futile. See
 
 Johnson v. Oroweat Foods Co.,
 
 785 F.2d 503, 509 (4th Cir.1986).
 

 The judgment of the district court is accordingly
 

 AFFIRMED.
 

 [1]
 

 . In addition, the suit sought, recovery of an administrative penalty imposed by the EPA by default against Carolina Transformer for violations of the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2601 et seq. The district court held Carolina Transformer solely liable for the TSCA penalty. The United States does not appeal that ruling.
 

 [2]
 

 . By default order dated September 19, 1984, issued pursuant to § 16 of the Toxic Substances Control Act, 15 U.S.C. § 2615, Carolina Transformer was ordered to pay an administrative penalty of $26,000 for violations of TSCA. As of the time of the third amended complaint, September 1988, Carolina Transformer had not complied with this order.
 

 [3]
 

 . We apply the law as it exists at the time of our decision.
 
 United States v. Schooner Peggy,
 
 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1802).
 

 [4]
 

 . Other courts have considered this issue as well.
 
 Cf, e.g., New York v. Shore Realty Corp.,
 
 759 F.2d 1032, 1052 (2d Cir.1985);
 
 Riverside Market Dev. v. Intern. Bldg. Products,
 
 931 F.2d 327 (5th Cir.),
 
 cert. denied,
 
 — U.S. —, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991).