ASCO HEALTHCARE, INC., Plaintiff,

v.

**HEART OF TEXAS HEALTH CARE AND REHABILITATION, INC.,** et al., Defendants.

Civ. No. L–04–1419.

United States District Court, D. Maryland.

March 27, 2008.

John M.G. Murphy, The Law Offices of John M.G. Murphy, Eric Radz, Ober Kaler Grimes and Shriver, Baltimore, MD, for Plaintiff.

Jeffrey E. Hansen, Law Offices of Hasten and Hansen, Arlington, TX, William Franklin Burton, William F. Burton Attorney at Law, Washington, DC, for Defendants.

## MEMORANDUM

BENSON EVERETT LEGG, Chief Judge.

This is a contract dispute between a Maryland pharmaceutical company and two successive owners of certain Texas health care and rehabilitation facilities. In the fall of 2002, plaintiff ASCO Healthcare, Inc. ("ASCO") contracted with subsidiaries of Heart of Texas Health Care and Rehabilitation, Inc. (collectively, "Heart of Texas") to provide pharmaceutical products and services to six health care facilities in Texas (the "Facilities") for a term of two years. On September 17, 2003, prior to the expiration of the contracts' term, Heart of Texas signed an agreement (the "Purchase Agreement") to sell the Facilities to Defendant Sam Jewell in an arms-length transaction. Under the terms of the Purchase Agreement, Heart of Texas did not purport to assign ASCO's pharmaceutical contracts to Jewell. On or about January 4, 2004, Jewell notified ASCO that the Facilities would be operating under new ownership effective February 4, 2004, and that he was not interested in assuming the pharmaceutical contracts between Heart of Texas and ASCO.

In response, ASCO sued Heart of Texas for terminating the contracts prior to the expiration of their two year terms and for unpaid invoices. ASCO also sued Jewell and the Texas corporations he created in connection with the sale (the "Legacy Defendants") for breach of contract. Heart of Texas failed to answer the Complaint. On January 19, 2005, the Court entered a default judgment against Heart of Texas in the amount of $1,674,162.00.[1]

---

1. This judgment is ostensibly uncollectible.

In order to prevail, ASCO must establish that it has the right to enforce the contracts against Jewell and/or the Legacy Defendants. ASCO concedes that these defendants did not expressly assume the pharmaceutical contracts. ASCO also does not contend that Heart of Texas's liabilities automatically followed its assets by operation of law as a result of the sale of the Facilities. Instead, ASCO predicates liability on the fact that the Legacy Defendants contractually undertook to oversee aspects of the Facilities' management during an interim period between the execution of the Purchase Agreement and the closing. During this interim period, ASCO continued to provide pharmaceuticals to the Facilities under the contract. For this reason, ASCO contends that the Legacy defendants assumed responsibility for the contracts. Jewell and the Legacy Defendants respond that (1) nothing in the record supports the finding that they assumed the ASCO contracts with Heart of Texas, and (2) they have insufficient contacts with Maryland for this Court to exercise personal jurisdiction over them.

On August 23, 2004, the Legacy Defendants filed a motion to dismiss for lack of personal jurisdiction. On December 22, 2004, the Court ruled that factual gaps in the record precluded a decision on the merits. The Court permitted ASCO to take jurisdiction-related discovery of the Legacy Defendants, and denied the Legacy Defendants' motion without prejudice to refiling at the conclusion of such discovery. After more than six months of discovery and two extensions of the briefing schedule, however, the parties failed to address the inadequacies in the record. As a re-

sult, on March 31, 2006, the Court denied the Legacy Defendants' renewed motion and ordered the parties to proceed to full discovery on the merits of the lawsuit.[2]

At the conclusion of full discovery, both parties moved for summary judgment. The complete record now before the Court demonstrates no grounds for finding that the Legacy Defendants actually or impliedly assumed the ASCO pharmaceutical contracts. Because these contracts constitute the only contact the defendants are alleged to have had with Maryland, this Court lacks personal jurisdiction over the defendants. Accordingly, the Court will grant the defendants' motion and dismiss the case.

## I. FACTUAL BACKGROUND

### A. The Parties

ASCO is a Maryland corporation with its principal place of business in Baltimore, Maryland. During all times relevant to this lawsuit, ASCO provided pharmaceutical products and services to health care facilities, such as nursing homes and hospitals, across the country.

The Legacy Defendants consist of six Texas corporations established by Jewell in connection with his purchase of the Facilities.[3] Jewell is the sole director and sole shareholder of each of the Legacy Defendants.

Heart of Texas was created when a company known as the 3927 Foundation, established in connection with a bond offering to finance the operation of the Facilities, filed for chapter 11 in October 2001. As part of the reorganization's effort to repay the 3927 Foundation's obli-

---

**2.** In light of the difficulties associated with compartmentalizing discovery, the Court ordered the parties to proceed to discovery on the merits of the claims with the understanding that such discovery would not be wasted if the case were to be litigated in another forum.

**3.** The Legacy Defendants are: (i) Vidor Manor, Inc.; (ii) Poteet Manor, Inc.; (iii) Mason Convalescent Care Center, Inc.; (iv) Kilgore Manor, Inc.; (v) Fort Worth Manor, Inc.; and (vi) Devine Convalescent Care Center, Inc.

gations under the bond offering, Heart of Texas took ownership of the Facilities and assumed responsibility for their operation. Pursuant to a revised Bond Indenture Agreement, Heart of Texas was to deposit all revenues generated by the Facilities' operation in a "lock box" account. The funds would then be distributed pursuant to the reorganization plan and Bond Indenture Agreement.[4]

Given the complexity of this process, Drushel Management Company ("Drushel") was retained to ensure that the Facilities' revenues were channeled to the appropriate creditors. Drushel did not participate in the Facilities' day-to-day management. Instead, its role was to receive periodic disbursements from the "lock box" account in order to pay the Facilities' operating expenses. It quickly became apparent, however, that the revenue stream generated by the Facilities would never be sufficient to satisfy all obligations under the reorganization plan.

### B. *The Pharmaceutical Contracts*

In the fall of 2002, ASCO and Heart of Texas entered into pharmaceutical contracts for each of Heart of Texas's six health care facilities.[5] These contracts made ASCO the sole and exclusive provider of pharmaceutical services and supplies to the Facilities for the contract's two-year term. According to the contracts, any sale of the facilities "would not constitute grounds for the termination or modification of this Agreement."

The contracts included a liquidated damages clause entitling the non-defaulting party to recover as liquidated damages "an amount equal to the average monthly billing multiplied by the remaining number of months or fractions thereof." Significantly, the contracts also provided that "[a]ny and all disputes arising under or related to the Agreement will be subject exclusively to the jurisdiction of the appropriate state court in Maryland, Baltimore County or federal court in the U.S. District Court of Maryland, Northern Division."

### C. *The Purchase Agreement*

Notwithstanding the reorganization's plan, the Facilities continued to struggle financially. Based on the conclusion that the reorganization could not succeed, the bankruptcy trustee decided to liquidate and began to market the Facilities to potential buyers.

On September 17, 2003, prior to the expiration of the pharmaceutical contracts' two-year term, Heart of Texas and Jewell entered into the Purchase Agreement for the sale of the Facilities.[6] The Purchase

---

**4.** Heart of Texas's current status was not briefed by the parties. There is no suggestion that Heart of Texas sought bankruptcy protection in connection with the sale of the Facilities. There is also no evidence, however, that Heart of Texas is an ongoing business entity with assets available to satisfy a judgment against it. In light of the factual record, it is likely that Heart of Texas, which was established for the sole purpose of owning and operating the Facilities, ceased to exist after it sold the Facilities to the Legacy Defendants and distributed the proceeds of this sale pursuant to the reorganization plan and the Bond Indenture Agreement.

**5.** The six facilities were: (i) Heart of Texas Health Care and Rehabilitation—Colonial; (ii) Heart of Texas Health Care and Rehabilitation—Grace Ponds; (iii) Heart of Texas Health Care and Rehabilitation—Kilgore; (iv) Heart of Texas Health Care and Rehabilitation—Mason; (v) Heart of Texas Health Care and Rehabilitation—Poteet; and (vi) Heart of Texas Health Care and Rehabilitation—Changing Seasons. All of these facilities are located in Texas.

**6.** The Purchase Agreement acknowledged that Jewell intended to create the Legacy Defendants, to which he would assign his rights and obligations under the Purchase Agreement at the time of closing.

Agreement provided that Jewell would purchase all of the "personal property, assets, goodwill and other intangible property, and the business associated with the Facilities." Any debts or liabilities not expressly assumed under the Purchase Agreement, however, were excluded from the sale. The Purchase Agreement also excluded "[a]ny past, present or future claims, expenses or liabilities of [Heart of Texas] ... related to the operation of the Facilities by [Heart of Texas] prior to the Closing Date ... [including] obligations to third party payors, vendors or employees of [Heart of Texas]." The list of contracts assumed pursuant to the Purchase Agreement did not include ASCO's pharmaceutical contract.[7]

The sale of the Facilities was scheduled to close on October 29, 2003. Because the Purchase Agreement required the Legacy Defendants to obtain the licenses required for the operation of the Facilities prior to closing, Jewell applied for these licenses on behalf of the Legacy Defendants after the Purchase Agreement was executed.

### D. *Interim Management of the Facilities*

As mentioned, the Purchase Agreement contemplated an interim period before the deal closed and the Legacy Defendants took ownership of the Facilities.[8] Accordingly, the parties negotiated two related agreements governing the Facilities' management during this period.

### 1. *The Management Agreement*

Initially, the parties intended that a management company owned by Jewell called Shady Grove, Inc. ("Shady Grove") would manage the Facilities until the sale closed. Accordingly, the Purchase Agreement stated the parties' intention that, between September 17, 2003 and the closing date, the operation of the Facilities would be governed by separate but identical management agreements between each of the six Facilities and Shady Grove (collectively, the "Management Agreement"). Under the Management Agreement, Shady Grove would replace Drushel, assuming responsibility for depositing the Facilities' revenues into the "lock box" account. Any operating expenses incurred by the Facilities would be paid from the funds allotted to the Facilities after the payment of prioritized claims under the reorganization plan and Bond Indenture Agreement. Although the Management Agreement authorized Jewell to draw on the funds made available to the Facilities in order to pay operating expenses, no management fees were paid to Jewell or Shady Grove for their services.

In addition, the Management Agreement appointed Shady Grove to "supervise, direct and control the day-to-day business activities and management" of the Facilities, "in the name of, on behalf of and for the account of [Heart of Texas.]" The Management Agreement provided that

---

7. ASCO does not contend that the Legacy Defendants assumed Heart of Texas's liabilities wholesale as a result of this transaction. *See, e.g., U.S. v. Carolina Transformer Co.* 978 F.2d 832, 838 (4th Cir.1992) ("The settled rule is that a corporation which acquires the assets of another corporation does not take the liabilities of the predecessor corporation from which the assets are acquired unless one of four generally recognized exceptions are met: (1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may be considered a 'mere continuation' of the predecessor; or (4) the transaction is fraudulent.").

8. The parties originally contemplated that the interim period would last approximately one month, with the deal scheduled to close on October 29, 2003. In actuality, the closing was delayed until February 4, 2004 due to difficulties the Legacy Defendants experienced in obtaining the licenses necessary to operate the facilities.

Heart of Texas would "retain and exercise control over the [Facilities'] assets" and required Shady Grove to perform its management duties in accordance with the "policies and directives of [Heart of Texas] that are currently in effect." Significantly, the Management Agreement required Shady Grove to "[m]aintain the current contracts for the purchase of all necessary ... medical ... supplies [and] equipment[.]"

Although the Management Agreement was executed on September 17, 2003, it was never implemented in full. Because Shady Grove and Jewell were unfamiliar with the procedures for depositing and distributing the Facilities' revenues, Drushel continued to perform these duties through October 31, 2003. The remainder of the Management Agreement provisions never took effect. Instead, the parties determined that the licensing process would be facilitated by a lease arrangement for each of the Facilities between Heart of Texas and the Legacy Defendants.

### 2. *The Lease Agreement*

Accordingly, Heart of Texas and the Legacy Defendants executed six individual leases (collectively, the "Lease Agreement") renting the Facilities to the Legacy Defendants from November 1, 2003 until the sale of the Facilities closed. The Lease Agreement expressly superseded the Management Agreement, stating that with the exception of the Purchase Agreement, no prior written agreements between the parties shall control.[9]

The Legacy Defendants did not pay rent to Heart of Texas under the Lease Agreement. Instead, the Legacy Defendants agreed to oversee the distribution of the Facilities' revenue into the "lock box" accounts as contemplated under the reor-

ganization plan and Bond Indenture Agreement, and to pay the Facilities' operating expenses from the funds distributed to them by the "lock box" trustee. Under the terms of the Lease Agreement, then, the Legacy Defendants effectively stepped into Drushel's shoes. There is no evidence, however, that the Legacy Defendants or Shady Grove assumed responsibility for the Facilities' day-to-day management under the Lease Agreement. That responsibility remained with Heart of Texas at all times prior to the closing.

### E. *Termination of the Pharmaceutical Contracts*

By late December 2003, the Facilities had all received the licenses required for the Legacy Defendants to take ownership of the Facilities. On January 4, 2004, in anticipation of the scheduled closing date, Jewell and the Facilities' administrators notified ASCO of the imminent change in ownership and informed ASCO that the Legacy Defendants would not be continuing with the pharmaceutical contracts once the sale closed. This lawsuit followed.

## II. ANALYSIS

The parties do not dispute that ASCO continued to fill pharmaceutical orders from the Facilities in the interim period between the execution of the Purchase Agreement on September 17, 2003 and the termination of ASCO's contracts on January 4, 2004. In its motion for summary judgment, ASCO contends that this fact demonstrates that the Legacy Defendants impliedly assumed the pharmaceutical contracts, making them liable for terminating those contracts before the expiration of their two year term.

---

**9.** The Lease Agreement does provide, however, for the Management Agreement to be rein-

stated in the event that the Lease Agreement was terminated.

The defendants respond that the Purchase Agreement expressly excludes the ASCO contract from their purchase of the Facilities and that the Legacy Defendants played a merely ministerial role in ensuring that the Facilities' revenues were distributed as directed by the reorganization plan and associated agreements. According to the defendants' motion for summary judgment, the defendants lack minimum contacts with this jurisdiction. As a result, the Legacy Defendants contend, this Court lacks personal jurisdiction over them. For the following reasons, the Court agrees.

### A. *Personal Jurisdiction Requirements*

In order for a federal court to exercise personal jurisdiction over a nonresident defendant, two requirements must be met: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Christian Science Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir.2001). Maryland courts have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Constitution. *See, e.g., Mohamed v. Michael*, 279 Md. 653, 370 A.2d 551, 553 (1977). Accordingly, the Court's statutory inquiry merges with its constitutional inquiry. *See Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135 (4th Cir.1996).

A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum, such that to require the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quotations omitted). In evaluating the sufficiency of a defendant's contacts with the forum state, the "constitutional touchtone" is whether the contacts were "purposefully established" by the defendant such that he "will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burns & Russell Co. of Baltimore v. Oldcastle, Inc.*, 198 F.Supp.2d 687, 690 (D.Md.2002) (internal quotations omitted).

In cases such as this where the defendant's contacts with the forum state are alleged to provide the basis for the lawsuit, the question is whether the Court has "specific jurisdiction" over the nonresident defendant. In determining whether specific jurisdiction exists, the Court considers the extent to which: (1) "the nonforum defendant purposely directed its activities toward residents of the forum state or purposely availed itself of the privilege of conducting activities therein; (2) plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) the forum's exercise of personal jurisdiction in the case is reasonable, i.e., is consistent with fair play and substantial justice." *Cape v. von Maur*, 932 F.Supp. 124, 126 (D.Md.1996).

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989). Typically, in the absence of an evidentiary hearing on jurisdictional questions, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Id., see also In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir.1997). Because this Court has permitted ASCO to conduct extensive jurisdictional discovery,

however, "plaintiffs must do more than merely establish personal jurisdiction by the prima facie standard." *Burns & Russell,* 198 F.Supp.2d at 689. Instead, ASCO must present substantial evidence to show that the defendants' had the requisite minimum contacts with Maryland to justify the Court's exercise of personal jurisdiction. *Id.*

B. *Defendants' Contacts with Maryland*

■ The Court finds that the defendants' contacts with Maryland do not rise to the level necessary to confer jurisdiction on this Court. It is undisputed that, under the terms of the Lease Agreement in effect during all times when the Legacy Defendants were involved in the management of the Facilities, the Legacy Defendants were simply responsible for ensuring that the Facilities' revenues were directed to the collective fund established in connection with the reorganization plan and Bond Indenture Agreement, and for channeling any additional available funds to pay the Facilities' operating expenses.[10] In effect, then, the defendants' role was to assume Drushel's responsibility for administering the Facilities' revenue stream.[11]

ASCO contends, however, that the fact that the Facilities placed orders for pharmaceutical supplies during the period covered by the Lease Agreements establishes that the Legacy Defendants purposefully availed themselves of the privilege of doing business in Maryland. The record does not support this conclusion. ASCO acknowledges that the orders received by the Facilities during this time period were placed using *Heart of Texas's* order forms. ASCO fails to identify any contacts with Maryland made by the defendants themselves. *Cape,* 932 F.Supp. at 127 ("[T]he exercise of personal jurisdiction requires that the minimum contact proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.") (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (emphasis provided)). Indeed, ASCO has presented no evidence that Jewell, the Legacy Defendants or Shady Grove ever placed pharmaceutical orders at all. In fact, one of the Facilities' administrators testified that the individuals ordering pharmaceutical supplies were "[t]he med aide, the charge nurse, the nursing management . . . basically the same people would be placing the order [after the ownership of the Facilities changed]."

In the absence of such contacts with Maryland, ASCO relies on the affidavit of ASCO Texas sales representative Stephen Knapp to establish that the defendants told ASCO sometime in or around December 2003 that the pharmaceutical contracts

---

**10.** Even assuming, *arguendo,* that the defendants assumed the more substantial role contemplated by the Management Agreement between Heart of Texas and Shady Grove, there is no evidence that their participation in the day-to-day management of the Facilities extended to impliedly adopting Heart of Texas's vendor contracts as their own such that exercising jurisdiction over the defendants would be proper. The Management Agreement expressly required Shady Grove to "[m]aintain the current contracts for the purchase of all necessary . . . medical . . . supplies [and] equipment[.]" The defendants' efforts to fulfill this contractual obligation do not consti-
tute "purposefully established" contacts with this forum. In addition, the Management Agreement made clear that Shady Grove's oversight of the Facilities would be "in the name of, on behalf of and for the account of [Heart of Texas.]"

**11.** Tellingly, ASCO has not named Drushel as a defendant to this lawsuit, despite the fact that ASCO continued to supply pharmaceutical products and services during the period from September 17, 2003 to October 31, 2003, when Drushel continued to act as the Facilities' manager.

should remain in effect. Specifically, Knapp states that Sharon Flowers, described as a representative of the defendants, "told me that the facilities might one day change pharmacy providers, but for now they wanted to continue with the contracts as they were." ASCO contends that this contact confers personal jurisdiction over the defendants.

Knapp's affidavit, though, merely confirms that the Legacy Defendants maintained the status quo during their time as tenants under the Lease Agreement—not that they "purposefully established" contacts with Maryland. Even assuming that Flowers confirmed the Facilities' continuing need for pharmaceutical supplies under the ASCO contract, there is no suggestion that she was acting on behalf of the Legacy Defendants, or that she had the authority to do so.[12] This involvement is insufficient to constitute the "minimum contacts" necessary to establish personal jurisdiction over the defendants. *See, e.g., Burns & Russell Co.,* 198 F.Supp.2d at 690 (finding no personal jurisdiction where alleged contacts consist of acts "of persons who have not been shown to have acted with authority granted by [defendant]" and where "plaintiffs have failed to establish that the contacts were in fact contacts by [defendant]."); *Nat'l Gypsum Co. v. Dalemark Indus., Inc.,* 773 F.Supp. 1476, 1481 (D.Kan.1991) (finding no personal jurisdiction over defendant AIJ where "AIJ was simply carrying out its performance under a contract with Dalemark" in shipping one order to plaintiff).

For these reasons, the Court finds that the defendants lack the requisite minimum contacts with Maryland to justify the Court's exercise of personal jurisdiction.[13]

## III. CONCLUSION

Accordingly, the Court will, by separate order, deny ASCO's motion to dismiss, grant the defendants' motion to dismiss, and dismiss the case. This dismissal is without prejudice, and ASCO may refile its claims in the proper forum.

---

12. The defendants submitted an affidavit by Flowers in response to ASCO's motion in which she states that she has no recollection of the conversation described in Knapp's affidavit, and that she "did not negotiate any contractual agreements with third party vendors, nor was I authorized to do so."

13. To a certain extent, the Court's jurisdictional finding is intertwined with the merits of ASCO's breach of contract claim. In finding that the defendants lack the requisite minimum contacts with Maryland for the purposes of personal jurisdiction, the Court necessarily opines that the defendants did not impliedly assume ASCO's pharmaceutical contract by virtue of spending two months overseeing the flow of the Facilities' financial resources. The Court has not examined, however, whether this finding would have preclusive effect in a lawsuit initiated in another forum, and expresses no opinion on this issue.