**State of NEW YORK, Plaintiff,**

v.

**NATIONAL SERVICES INDUSTRIES, INC. Defendants.**

**No. 99–CV–2745.**

United States District Court, E.D. New York.

Feb. 16, 2001.

Eliot Spitzer, Attorney General of the State of New York by Carter H. Strickland, Jr., Assistant Attorney General, New York State Dept. of Law, Environmental Protection Bureau, New York City, for plaintiff State of New York.

King & Spalding by Beverlee E. Silva, Atlanta, GA, for defendant.

*Memorandum Of Decision And Order*

MISHLER, District Judge.

This is an action, brought by the State of New York (the "State") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), to hold National Service Indus., Inc. ("NSI") liable for cleanup costs incurred by the State at the Town of Islip municipal landfill on Blydenburgh Road in Islip, New York (the "Blydenburgh Landfill"). Presently before the Court are NSI's and the State's cross-motions for summary judgement. NSI requests that the Court grant summary judgment in its favor and dismiss the claims against it. The State cross-moves for partial summary judgement, requesting that NSI's fifth affirma-

tive defense be dismissed,[1] and seeking a declaratory judgment that NSI is the legal successor to Serv–All Uniform Rental Corporation ("Serv–All") for purposes of CERCLA liability. For the following reasons, NSI's motion is denied, and the State's cross-motion is granted.

## BACKGROUND

From 1962 until 1988, Serv–All operated an industrial garment rental service out of a facility located in the Town of Bayshore, New York. Serv–All rented uniforms and other industrial garments to commercial customers. As part of its service, Serv–All dry-cleaned the rented uniforms using the solvent perchloroehtylene ("PCE"). PCE is a hazardous substance within the meaning of Section 101(14) of CERCLA.

On or about June 1978, Serv–All arranged with Hicky Carting Co., Inc. ("Hicky") for the disposal or transport for disposal of several 55 gallon drums of liquid waste which contained PCE.[2] Hickey was not a "certified waste hauler." Serv–All had been provided with a list of "certified waste haulers" by the Suffolk County Department of Environmental Control, however, Serv–All chose to employ Hicky instead, allegedly because the approved waste haulers were more expensive.

In 1988 Ralph Colantuoni and William Lepido, Serve–All's two principals, decided to retire from the garment industry. On or about October 18, 1988, Initial Service Investments ("Initial") entered into an "Asset Sale Agreement", whereby it agreed to purchase certain assets, including customer contracts, customer lists, all of Serv–All's trucks, and the right to use or retire Serv–All's name. The purchase price was approximately $2,229,000.00. As part of the Asset Sale Agreement, Mr. Lepido and Mr. Colantuoni entered into covenants not to compete with NSI. These covenants required them not to use the Serv–All name and not to compete for seven years with NSI in the garment rental service business. On November 6, 1992, NSI acquired all shares in Initial, and on August 31, 1995 Initial merged into Serv–All.

The Blydenburgh Landfill was listed in the New York Registry of Hazardous Waste Sites in 1983, and the listing states that there was confirmed disposal of oil, trichlorethylene and vinyl chloride beginning in 1978, the date of the illegal disposal of wastes generated by Serv–All. The Blydenburgh Landfill was proposed for listing on the U.S. Environmental Protection Agency's Priority List in January 1987, and has since been listed on the federal National Priority List of the most contaminated hazardous waste sites in the United States.

The Complaint in the immediate action was filed on May 14, 1999. The State

---

1. In addition to asserting lack of successor liability as an affirmative defense. NSI's first counterclaim is for "Declaratory Relief Under CERCLA", in which it requests a declaratory judgment that "(a) NSI is not a potentially responsible person who may be held liable for any response costs incurred pursuant to CERCLA in relation to the Landfill: and (b) NSI is not, therefore, jointly and severally liable under CERCLA for any response costs, reimbursement for natural resource damages, or contribution to be incurred or claimed by any party to this action, or any other entity in relation to the Landfill." Defendant National Service Industries Answer, Affirmative Defenses and Counterclaim ¶ 16. To the extent that this counterclaim is premised on NSI's assertion that it is not Serv–All's legal successor, this claim is also disposed of by this motion.

2. Hickey was sued for its participation in the alleged environmental infractions which are the subject of this case in an action brought in New York State Supreme Court. See State of New York v. Hickey's Carting et al., Index No. 79–14704.

seeks: (a) recovery of its costs of responding to and abating the release and/or threatened release of hazardous substances at and/or from the Blydenburgh Landfill, including but not limited to all payments made by the State to the Town of Islip for the implementation of the remedial program at the Landfill: and (b) a declaratory judgment that NSI is strictly liable to the State for all future costs it may so incur. NSI asserts, as its fifth affirmative defense that:

> NSI is not Serv–All Uniform Rental Corp.'s ("Serv–All") legal successor. Consequently, NSI bears no legal responsibility for the acts of Serv–All and cannot be liable for cleanup costs resulting from Serv–All's activities.

The State responds to this affirmative defense by asserting that NSI purchased Serv–All as an ongoing business and acquired all or substantially all of Serv–All's assets, and thus, is Serv–All's legal successor for CERCLA liability purposes.

## STANDARD

A court should grant summary judgment if, when viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c): *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). A party seeking summary judgment must demonstrate the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant demonstrates an absence of material issues of fact, a limited burden of production shifts to the nonmovant, which must "demonstrate more than 'some metaphysical doubt as to the material facts ... [and] must come forward with specific facts showing that there is a genuine issue for trial.'" *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993) (citations and emphasis omitted). If the nonmovant fails to meet this burden, summary judgment should be granted.

Both NSI and the State agree that there are no genuine issues of material fact concerning the issue of successor liability. Accordingly, the parties have conceded that summary judgment on this issue is appropriate.[3]

## DISCUSSION

■ In the Second Circuit, successor liability for CERCLA purposes is analyzed under a "substantial continuity" test. *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1996). Pursuant to this test, a court analyzes the following eight factors to determine whether an entity is a "substantial continuation" of its predecessor and thus subject to CERCLA liability. These eight factors are:

(1) retention of the same employees;

(2) retention of the same supervisory personnel;

---

**3.** In its Local Rule 56.1(b) Statement of Material Facts In Support of Defendant's Opposition to Plaintiff's Motion For Partial Summary Judgment, NSI states that "Defendant NSI does not contend, for purposes of this Summary Judgment Motion only, there are any genuine issues of material fact which should be tried by a finder of fact." Likewise. NSI states on page one of its brief in Response to the State of New York's Motion for Summary Judgment that "[b]oth sides clearly

agree that this issue is appropriate for disposition on summary judgment ... In order to simplify these proceedings. NSI is willing—for the sole purpose of resolution of these dueling Summary Judgment Motions—to accept that there are no genuine issues of material fact in this case." *See also* Plaintiff's Memorandum of Law in Reply to Defendant's Answering Memorandum of Law at p. 1 ("The parties do not dispute the facts that are material under the substantial continuation test").

(3) retention of the same production facilities in the same location;

(4) production of the same product;

(5) retention of the same name;

(6) continuity of the same general business operations;

(7) continuity of assets; and

(8) whether the successor holds itself out as the continuation of the previous enterprise.

*Town of Oyster Bay v. Occidental Chemical Corp.*, 987 F.Supp. 182, 206 (E.D.N.Y. 1997) (quoting *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir.1992)).[4] This test is designed to "identify[ ] transactions where the essential and relevant characteristics of the selling corporation survive the asset sale and it is therefore equitable to charge the purchaser with the seller's liabilities," *New York v. Westwood–Squibb Pharmaceutical Co.*, 62 F.Supp.2d 1035, 1038 (W.D.N.Y.1999) (quoting *North Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 651 (7th Cir.1998)).

 Application of the "substantial continuity" test to the conceded facts in this case makes clear that NSI is Serv–All's legal successor to liability arising out of the Blydenburgh Landfill. Pursuant to the Asset Sale Agreement between Serv–All and Initial. Initial acquired substan-tially all of Serv–All's assets. Specifically, the agreement provided, *inter alia*, that:

(1) Serv–All was required to provide a warranty that the asset transfer was "sufficient to meet the needs" of Serv–All's customers;

(2) Serv–All transferred to Initial all "rights, title and interests" in Serv–All's contracts and accounts for "industrial service and the providing of industrial garments, mats, dust mops, wipers, and all other items";

(3) Initial agreed to assume and perform Serv–All's obligations under existing contracts;

(4) Initial acquired all of Serv–All's customer records, including "all customer lists, daily delivery lists, records and other similar data";

(5) Initial acquired all of Serv–All's "in service inventory and circulating inventory or used inventory, consisting of, among other things, industrial garments, mats, dust mops, wipers and other items and garments";

(6) Initial acquired all of Serv–All's "non-obsolete new inventory";

(7) Initial acquired all of Serv–All's accounts receivable;

(8) Initial acquired all of Serv–All's trucks, including spares and out of service vehicles.

4. NSI asserts that, in view of recent Supreme Court opinions indicating that federal common law holds a limited office in CERCLA actions, the "substantial continuity" test should now be abrogated, and state corporate law standards for successor liability should be employed. *See United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998): *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994): *Atherton v. FDIC*, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997). In rejecting this argument, we note that the Second Circuit heard a motion for reconsideration of its *B.F. Goodrich* decision, in which the movant cited several of the referenced Supreme Court deci-sions. In spite of this Supreme Court precedent, the Second Circuit affirmed its earlier decision noting that "our primary reason for adopting a federal common law rule was our concern that allowing state rules such as the inflexible and easily evaded 'identity' rule to control the question of successor liability would defeat the goals of CERCLA." *B.F. Goodrich v. Betkoski*, 112 F.3d 88, 91 (2d Cir.1997). We additionally note that application of the federal "substantial continuity" test to CERCLA actions in no way frustrates the policies or interests underlying state corporate law. Accordingly, we decline to depart from the Second Circuit precedent applying the "substantial continuity" test.

(9) Initial acquired all of Serv–All's "rights, title and interest" in the name "Serv–All Uniform Rental Corp.";

(10) Initial acquired all of Serv–All's miscellaneous office supplies, including a computer, jack, metal cabinet, insulated jackets with the name "Serv–All" sown on them, and paper towels;

(11) Initial also acquired Serv–All's hangers, rail system, garage equipment, truck parts, heat sealer button machine, manual tape coding machine:

(12) Initial assumed the right to collect accounts receivable from over 185 of Serv–All's customers:

(13) Initial received covenants not to compete from Mr. Colantuaoni and Mr. Lepido, which ran for seven years and covered all of New York, New Jersey and Connecticut, and

(14) The owners of Serv–All agreed to stop using the name "Serv–All" or any similar name.

Additionally, the Asset Sale Agreement was valued based upon Serv–All's revenues as an ongoing operation, not by the sum of the assets, and on the same day that the agreement was executed. Mr. Colantuoni and Mr. Lepido adopted a plan of complete liquidation and dissolution of Serv–All. Furthermore, following the Asset Sale Agreement, Initial continued Serv–All's operations by employing many of Serv–All's employees,[5] including all of its truck drivers, providing the same uniforms and service that Serv–All provided, charging the same rates that Serv–All had provided, and using trucks and invoices which displayed the name "Serv–All."

We find, additionally, that Initial was on notice of Serv–All's potential environmental liabilities at the time of the Asset Sale Agreement. Although not specifically listed as a factor for consideration, several courts have held that "notice of the seller's potential liabilities" is an additional factor "relevant to a determination of whether successor liability should attach under the substantial continuity test." *Town of Oyster Bay*, 987 F.Supp. at 206. Here, there was, in 1979, a proceeding before the New York State Department of Environmental Conservation, which found that Serv–All had arranged for the disposal of hazardous materials at the Blydenburgh Landfill. *See* Appendix to Brief in Support of NSI's Motion for Summary Judgment, Exs. D—H. This decision has been confirmed, not only by the Commissioner of the Department of Environmental Conservation, but also in publically reported judicial decisions by New York State Courts. *See Hickey's Carting, Inc. v. Commissioner of Environmental Conservation*, 76 A.D.2d 1039, 428 N.Y.S.2d 768 (1980), *app. denied*, 54 N.Y.2d 609, 445 N.Y.S.2d 1027, 429 N.E.2d 835 (1981). In view of this publically available information. NSI cannot now claim that Initial had no notice of Serv–All's potential environmental liabilities with regard to the Blydenburgh Landfill at the time of the Asset Sale Agreement.[6] Accordingly, this factor further

---

**5.** These assertions are set forth in paragraphs 39 – 55, 58, 66–70 and 76–78 of the State's Local Rule 56.1 Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment, and are not contested in NSI's Local Rule 56.1(b) Statement of Material Facts in Support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment. Accordingly, the truth of these statements is deemed admitted. Local Civil Rule 56.1(c) provides that "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

**6.** We additionally note that paragraph 22 of the State's Local Rule 56.1 Statement of Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment provides that "Initial knew that Serv–All URC was for sale

militates in favor of a finding that NSI is Serv–All's legal successor.

NSI argues that the notion that Initial was a substantial continuation of Serv–All is undermined by the fact that the Serv–All's operating facility at 8 Drayton Avenue was not transferred to Initial. Although, "retention of the same production facilities in the same location" is one of the factors that a court is to consider under the "substantial continuity" test, we find that the fact that Serv–All's plant was not transferred to Initial did not interfere with Initial's substantial continuation of Serv–All's operations. First, as the State argues, "Serve–All URC had no true production facilities, because at the time of the sale it sent its garments to another company for cleaning and used the 8 Drayton Avenue facility only for assembling the garments into routes." Plaintiff's Memorandum of Law in Support of its Motion for Partial Summary Judgment, p. 24. Additionally, the fact that the plant at 8 Drayton Avenue was not included in the Asset Sale Agreement is not surprising, considering the fact that this plant was not owned by Serv–All. The building at 8 Drayton Avenue was held by a separate company named "8 Drayton Avenue Associates", which was a d/b/a for William Lepido and Ralph Colantuani. Serv–All's two principals. *See* Colantuoni Aff. ¶ 5.[7] Thus, we reject NSI's agreement that Initial's failure to acquire and operate out of the 8 Drayton Avenue facility impacted on its continuation of Serv–All's operations.

NSI additionally claims that it should not be held liable for Serv–All's environmental liabilities relating to the Blydenburgh Landfill because it did not continue Serv–All's dry cleaning operations, which, NSI asserts, was the conduct that gave rise to the environmental liability in the first place. We find, however, that the fact that NSI employed a different cleaning process from that which created the environmental hazard, does not, under the "substantial continuity" analysis, cut off NSI's successor liability for Serv–All's alleged infractions. First, even though Initial and subsequently NSI did not dry clean its customers uniforms, on a whole, it appears that the Asset Sale Agreement was structured such that Initial could take over Serv–All's business operations, and Serv–All's customers would notice no change in service. Additionally, we note that the CERCLA claims brought against NSI do not stem directly from Serv–All's dry-cleaning of uniforms, but rather from Serv–All's "arranging" for the disposition of certain hazardous by-products of that dry-cleaning. Under CERCLA, "arrangers" of off-site disposal of hazardous materials are strictly liable for the costs of cleaning up contamination regardless of fault or knowledge. *See* 42 U.S.C. § 9607(a). Thus, because we find that NSI is a substantial continuation of Serv–All's business, the fact that NSI has not performed any dry-cleaning operations itself since the Asset Sale Agreement does not absolve NSI of successor liability under CERCLA.

Accordingly, applying the the "substantial continuity" factors to the conceded facts, we find that NSI's operations were a

---

because of environmental problems." NSI does not deny or otherwise object to this statements in its Local Rule 56.1(b) Statement of Material Facts in Support of Defendant's Opposition to Plaintiffs Motion for Partial Summary Judgment. Accordingly, the truth of this statement is deemed conceded.

7. Similarly, NSI points to the fact that the Asset Sale Agreement did not transfer ownership of certain dry cleaning equipment. However, it is undisputed that this equipment was not owned by Serv–All URC, but was owned by Serv–All Cleaners. Inc., a wholly separate corporate entity.

substantial continuation of Serv–All's business, and thus, NSI is subject to successor liability for Serv–All's environmental infractions.

## CONCLUSION

For the forgoing reasons the State's motion for partial summary judgment dismissing NSI's fifth affirmative defense and for a declaratory judgement that NSI is the legal successor to Serv–All is GRANTED. NSI's motion for summary judgment is DENIED.

SO ORDERED.

Martin A. LEHMAN, Plaintiff,

v.

Barbara KORNBLAU, individually and in her official capacity as an Assistant District Attorney of Nassau County, Dennis E. Dillon, individually and in his official capacity as District Attorney of Nassau County, Francis D. Quigley, individually and in his official capacity in the Nassau County District Attorney's Office, Robert L. Emmons, individually and in his official capacity in the Nassau County District Attorney's Office, Rodolfo Barrio, individually and in his official capacity as a Nassau County Police Officer, Joseph Molinelli, Mary Flynn, County of Nassau, and United States Postal Service, Defendants.

No. CV 99–6517(ADS).

United States District Court,
E.D. New York.

March 8, 2001.

Martin A. Lehman, West Hempstead, NY, pro se.

Alfred F. Samenga, Office of the County Attorney, County of Nassau, Mineola, NY, by Louis F. Chisari, Deputy County Attorney, for Barbara Kornblau, Dennis Dillon, Francis D. Quigley, Robert L. Emmons, Rodolfo Barrio, J. Algieri, George V. Cats, County of Nassau.

Joseph Molinelli, Shirley, NY, pro se.

Loretta Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY, by Paul Kaufman, Assistant United States Attorney, for Mary Flynn, John Doe, United States Postal Service.

Stockman Wallach Lentz & Garnell, LLP, New York City, by Roger A. Goodnough, of counsel, for George Roberts, Scott Jaffer, Atlantic Mutual Insurance Company.

Linda Farrell, Morris Plains, NJ, pro se.

Savona & Scully, New York City, by Joseph F.X. Savona, Raymond M. D'Erasmo, of counsel, for Phillip T. Blessinger, National Insurance Crime Bureau, CIGNA Insurance Company.

Goldman & Grossman, New York City, by Eleanor R. Goldman, of counsel, for Daphne J. Stasca, Sunnydale Farms Company.

Lester Schwab Katz & Dwyer, New York City, by Thomas A. Catalano, of counsel, for Zurich American Insurance Company.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This lawsuit arises out of a claim by Martin A. Lehman (the "plaintiff," or "the doctor"), an orthopedic surgeon in Nassau County, that the defendants, Barbara Kornblau ("Kornblau"), Dennis Dillon ("Dillon"), Francis D. Quigley ("Quigley"), Robert L. Emmons ("Emmons") Rodolfo Barrio ("Barrio"), J. Algieri ("Algieri"), the

County of Nassau ("County") (collectively, the "County defendants"), Mary Flynn ("Flynn"), John Doe ("Doe"), the United States Postal Service ("Postal Service") (collectively, the "Postal Service defendants"), George Roberts ("Roberts"), Scott Jaffer ("Jaffer"), the Atlantic Mutual Insurance Company ("Atlantic") (collectively, the "Atlantic defendants"), Phillip T. Blessinger ("Blessinger"), the National Insurance Crime Bureau ("NICB") (collectively, the "NICB defendants"), Daphne J. Stasca ("Stasca"), Sunnydale Farms Company ("Sunnydale") (collectively, the "Sunnydale defendants"), Zurich American Insurance Company ("Zurich"), CIGNA Insurance Company ("CIGNA"), Joseph Molinelli ("Molinelli"), and Linda Farrell ("Farrell") conspired to maliciously prosecute him for insurance fraud. Presently before the Court are motions to dismiss the complaint by the County defendants, the Postal Service defendants, the Atlantic defendants, the Sunnydale defendants, and Zurich.

### I. BACKGROUND

The following facts are taken from the complaint. In December 1995, defendant Kornblau, an Assistant District Attorney ("A.D.A.") in the Nassau County District Attorney's Office ("D.A.'s Office") held a meeting where a plan to entrap and maliciously prosecute the plaintiff was hatched. The meeting was held under the supervision of Dillon, the Nassau County District Attorney, A.D.A. Quigley, and A.D.A. Emmons, all of whom were employed by the County. Other people who attended the meeting included: Barrio, who is a detective in the Nassau County Police Department, Molinelli, who the plaintiff contends was a convicted felon and confidential informant, Jaffer, who is a Worker's Compensation Coordinator at Atlantic, Stasca, who is an officer at Sunnydale, and an unnamed representative of the NICB. The

plaintiff alleges that at this meeting, Molinelli and Flynn agreed to pretend to be patients who had suffered physical injuries while at work.

On December 22, 1995, Molinelli saw the doctor and told him that he had suffered injuries on the job at Sunnydale. Molinelli complained of pain in his back, neck, and right knee. The doctor performed a physical examination, took x-rays, gave Molinelli a muscle relaxant, and advised Molinelli to start physical therapy. Molinelli returned to the doctor's office on several occasions. He told the doctor that he was still in pain and asked the plaintiff for disability notes.

On April 26, 1996, Molinelli returned to the plaintiff's office with Farrell, who is a medical case worker for worker's compensation claims at Atlantic. The doctor told Molinelli and Farrell that Molinelli could return to light duty. Farrell responded that Molinelli's job did not entail any light duty.

The plaintiff alleges that Flynn participated in the conspiracy by claiming that she had been hit by a bus on March 14, 1996, and by complaining to the doctor about injuries to her back and left hip. The plaintiff alleges that Postal Service supervisor John Doe approved Flynn's conduct.

On May 7, 1996, Barrio visited the doctor and told the doctor that his name was Joseph Batista, he worked at Sunnydale, and he had injured his back and neck at work the previous day. On September 11, 1996, Barrio returned to the doctor's office with Farrell. The doctor told Barrio that he should try to return to light work, but Farrell told the doctor that no such work was available. The doctor told Barrio that he should return to his usual work.

Although the complaint is vague, the plaintiff seems to allege that Barrio committed perjury when he applied for an arrest warrant on May 16, 1997. The plaintiff also appears to claim that the D.A.'s Office suborned Barrio's alleged perjury by assisting him in preparing his warrant application.

The plaintiff was arrested on May 21, 1997. That same day, Dillon allegedly told *Newsday,* " 'Lehman, 64, a Wantagh orthopedist, is shown meeting with an undercover operative who tells Lehman she was working despite being injured in an accident. You are not working as far as insurance is concerned, Lehman is heard telling the woman without performing a physical examination. Lehman gave the woman a disability form, Dillon said' " (complaint, ¶ 66). The plaintiff contends that this statement was untrue, and that the D.A.'s Office was in possession of tapes that support his contention.

The doctor claims that Algieri and Cats participated in the conspiracy by supervising and approving Barrio's actions and by monitoring and recording video and audio tapes. The plaintiff asserts that from the twenty-three videotapes that had been made in connection with the D.A.'s investigation, five did not contain any recorded images.

The plaintiff also contends that Blessinger, who is a "Special Investigator" with the NICB, also monitored the taping. The plaintiff further alleges that Blessinger telephoned the plaintiff's office impersonating Molinelli and accompanied Molinelli to the plaintiff's office on several occasions.

The plaintiff claims that the following defendants "participated in the conspiracy to set-up, entrap and frame the Plaintiff to deprive him of his civil rights": Roberts, Jaffer, Atlantic, CIGNA, Zurich, NICB, Sunnydale, the County, and the Postal Service.

The plaintiff also alleges that Barrio, Molinelli, and Flynn committed perjury when they testified before the Grand Jury. According to the plaintiff, Barrio told the Grand Jury that he was out on disability from May 1996 through March 1997, and he never saw a doctor, other than the plaintiff, during that time (*see* complaint ¶ 56). The plaintiff contends that this testimony was untruthful, because Barrio used an alias to see three other doctors during this period (*see* complaint ¶ 57).

The plaintiff asserts that, in the Grand Jury, Molinelli testified that he did not complain of neck pain when he first visited the doctor he told the doctor. The plaintiff claims that this testimony was untruthful, because at the criminal trial, Molinelli told the jury that he had complained of neck pain during his first visit to the doctor's office.

The plaintiff claims that Flynn told the Grand Jury that she did not complain of pain when the doctor moved her leg and hip in a certain manner. According to the plaintiff, this testimony was false, because audio tape-recording of Flynn's first visit to the plaintiff's office indicates that she told the doctor that her hip did hurt when he moved her leg in a particular fashion.

The plaintiff states that on March 3, 1999, after an eight-week trial, a jury acquitted him of all charges. The plaintiff contends that during the trial, the "operatives" said that they never complained of pain, discomfort, or disability during their visits to his office.

The plaintiff asserts seven causes of action. He contends:

## FIRST CAUSE OF ACTION....

71. Plaintiff was subject to a conspiracy to interfere with his civil rights in violation of 42 U.S.C. § 1983 and 42 U.S.C. § 1985 and 28 U.S.C. § 1343.

## SECOND CAUSE OF ACTION....

73. Plaintiff was subjected to unwarranted search and seizure in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 28 U.S.C. § 1343 and the 4th Amendment of the Constitution of the United States of America.

## THIRD CAUSE OF ACTION....

75. Plaintiff was subjected to malicious intention to find probable cause to indict, legal advise to commit perjury in sworn affidavit and Grand jury testimony and malicious prosecution in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 28 U.S.C. § 1343.

## FOURTH CAUSE OF ACTION....

77. Plaintiff was subjected under color of law [to] perjured testimony by law enforcement officers and a confidential informant under their control in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 28 U.S.C. § 1343.

## FIFTH CAUSE OF ACTION....

79. Plaintiff was subject to malicious falsehood in press conferences and releases in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985 and 28 U.S.C. § 1343.

## SIXTH CAUSE OF ACTION....

81. Plaintiff was subject to loss of liberty, loss of ability to earn a living, unwarranted search and to spend huge sums of money to defend himself in a criminal prosecution in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1988 and 28 U.S.C. § 1343.

## SEVENTH CAUSE OF ACTION....

83. Defendants have acted under color of law pursuant to official policy on in

conjunction with law enforcement officials in contravention of Plaintiff's constitutional and statutory rights as set forth, but not limited to, the Fourth and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986 and 28 U.S.C. § 1343.